678 S.E.2d 812

**The STATE, Respondent,**

v.

**Roy Otis TENNANT, Appellant.**

**No. 4545.**

Court of Appeals of South Carolina.

Heard Feb. 18, 2009.

Decided May 18, 2009.

Rehearing Denied June 29, 2009.

Deputy Chief Appellate Defender for Capital Appeals Robert M. Dudek, of Columbia; E. Charles Grose, Jr., of Greenwood; and Tara Schultz, of Rock Hill, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attor-

ney General Salley W. Elliott, and Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia, for Respondent.

SHORT, J.:

Roy Otis Tennant appeals his convictions of first-degree criminal sexual conduct, kidnapping, and assault and battery of a high and aggravated nature (ABHAN). Tennant argues the trial court erred in: (1) refusing to allow Doctor Donna Schwartz–Watts (Schwartz–Watts) to testify about his mental illness because the testimony pertained to his state of mind and the issue of consent, as well as impeached the alleged victim's testimony; (2) excluding his suicide note because the note was probative to his state of mind and relevant to his defense of consent; (3) excluding his suicide note because the note was admissible under Rule 106, SCRE, the victim was allowed to read a letter from Tennant, and he was entitled to show the context of his writings under the rule of completeness; and (4) refusing to allow him to question the victim and introduce evidence of their sexual relationship because the couple's unusual sexual history included "rough sex," and the infliction of pain was necessary for the jury to understand his defense of consent and to corroborate Schwartz–Watts's testimony. We affirm.

## FACTS

Tennant and Victim married in 1992. After nine years of marriage and three children together,[1] Victim received an order of protection against Tennant in February 2001, and filed for divorce. Their divorce was finalized on November 26, 2001.

On the day of their divorce, Victim left the courthouse, went to the laundry, and then to work. While Victim was at work, Tennant repeatedly called her, wanting to discuss the divorce and telling her that he had something for her. After work, she drove to Tennant's grandmother's house[2] to pick up her

---

1. Victim had a total of four children; Tennant did not father the eldest.

2. Victim's children stayed at Tennant's grandmother's house, where Tennant lived, while she worked.

children. When she arrived, Tennant exited the house carrying a brown paper bag. He approached the driver's door window of her car, began talking to her about the divorce, and again stated he wanted to give her something. Victim informed him she did not want to talk, and she just wanted to pick up her children and go home. Eventually, Tennant got into the passenger seat of her vehicle and began searching in his brown paper bag. He began questioning her about an alleged relationship she had with another man, pulled a cord out of his brown paper bag, and strangled her until she lost consciousness.

Victim regained consciousness, and realized she was in the trunk of her car, which was moving. After she kicked the speakers out of the trunk, Tennant stopped the car. He duct-taped her hands together after pulling her out of the trunk, but she convinced him to remove the tape. After removing the duct tape, he told Victim if she ran he would stab her in the legs with his knife. Tennant told her that he did not want a divorce, apologized, and stated he did not mean for things to go this far. He also told Victim that he knew how to choke her without killing her and he wanted to have sex with her. She told Tennant she would have sex with him.[3] Tennant removed Victim's clothes, laid her on the ground beside her vehicle, and had sex with her. Afterwards, he helped her get up and put her clothes back on. Next, Tennant took Victim back to his grandmother's house and instructed her to go to the back bedroom. He told her she was not free to leave until the next morning when she took the children to school. Overnight, they had sex again.

The next morning, while driving her children to school, Victim flagged down a police officer to report the assault. As a result, Tennant was arrested on November 27, 2001. When the police arrested him, he had overdosed on his psychotic medication. Additionally, the police found a note[4] (the suicide note) that read:

---

**3.** At trial, Victim testified she would have told Tennant anything because she was scared of him hurting her.

**4.** Tennant characterized this note as a suicide note. However, the State maintained this note was not a suicide note, but contended that a different note, not introduced at trial, was the actual suicide note.

[Victim] you told ... the police that I raped you and you know I did not. You told me that you wanted to make love to me from the first day I got out of jail. And you hadn't already because you said I might try and use it against you in our divorce. I asked you if you wanted to make love to me and you said yes, and started kissing me.

Tennant was charged with kidnapping, assault and battery with intent to kill, first degree criminal sexual conduct, violating an order of protection, and possession of a firearm or knife during the commission of a violent crime.

Before trial, Tennant submitted a written motion and offer of proof pursuant to South Carolina Code Section 16–3–659.1 (2003), commonly referred to as the Rape Shield Statute. He sought to introduce evidence of Victim's sexual conduct, including their sexual history. Specifically, he contended the proffer outlined the unusual dynamics of their sexual relationship. The proffer contained statements of when and how Tennant and Victim met, allegations of her promiscuity, allegations of her involvement in adultery, statements that Tennant and Victim had a sexual relationship, allegations her promiscuity led to his drug and alcohol problems, allegations she would self-inflict wounds during arguments and blame them on Tennant, letters he wrote to his doctor and the solicitor, and allegations he could not sexually satisfy Victim.[5] He maintained this information was admissible for the following reasons: (1) the information pertained to Victim's motive to make false allegations because she was angry he exposed her affair and he was divulging details of her lifestyle; (2) the information was relevant to Schwartz–Watts's expert opinion that Tennant was mentally ill and depressed at the time of the incident because Victim's allegations cannot be separated from the nature of their sexual relationship; and (3) much of the conduct involved adultery, which is not excluded by the Rape Shield Statute.

---

5. While Tennant maintains on appeal the proffer contains evidence of his sexual history with Victim, including "rough sex," the closest statement in the proffer actually characterizing Victim's sexual preferences to include "rough sex" is located in proffer thirteen. Proffer thirteen references one of Tennant's writings describing their sexual relationship: "I tried everything to satisfy her normal but she wanted me to hurt her and it was not normal and I never done it and she stopped wanting sex."

At trial, prior to Victim's testimony, the State sought to limit Victim's cross-examination pursuant to the Rape Shield Statute. The State conceded Tennant could ask Victim if she committed adultery and, if she denied any adultery, he could prove specific instances of adulterous conduct. However, the State maintained the written proffer addressing Victim's sexual history was not relevant. Additionally, the State argued the proffer contained large amounts of hearsay that was both irrelevant and inadmissible. Tennant argued the Rape Shield Statute did not apply to conduct between Victim and Tennant, or to Victim's adulterous conduct. The trial court determined the Rape Shield Statute allowed very few instances of the victim's sexual conduct with the defendant or any other individual. Accordingly, the trial court ruled Tennant's proffered evidence was not admissible.[6] Tennant requested that the court take up the issue again "either at the end of [Victim's] direct [testimony] or at the end of her testimony altogether." The trial court replied: "Yes. I mean, if I hear something different or if you think you hear something different, then we'll do it." Nevertheless, Tennant did not attempt to elicit any testimony regarding the excluded proffered evidence during Victim's cross-examination, nor did he re-assert the issue of the evidence's admissibility at the close of her direct-examination or testimony.

Additionally, at trial, Tennant unsuccessfully sought to introduce the suicide note. Tennant argued its exclusion hindered him from effectively presenting a defense of consent. The State maintained the note was self-serving hearsay, and objected to its introduction.

Later, during Victim's testimony, she testified she received a letter from Tennant (the response letter) while he was in jail in response to a letter she sent him. The response letter apologized for "everything that happened back in November," discussed religion, and expressed his happiness that she was reading her Bible. It also asked for her forgiveness and friendship after his release from jail. After the response letter was entered into evidence, Tennant again proffered the

---

**6.** Moreover, at the close of Tennant's proffer of Schwartz–Watts, the trial court reiterated the exclusion of testimony regarding Victim's prior sexual history pursuant to the Rape Shield Statute.

suicide note. He cited Rule 106, SCRE, and argued the State introduced a writing to show he was remorseful and asking for forgiveness, and pursuant to Rule 106, the suicide note should be considered at the same time. The State contended the suicide note was not actually a suicide note, and was "not a note in response, or a writing that has any way, a connection to [the response] letter." Additionally, the State argued the suicide note had nothing to do with the response letter and the two were not contemporaneous. Moreover, the State asserted the suicide note was a self-serving statement that attempted to prove consent. The trial court ruled the suicide note inadmissible.

Next, Tennant argued the suicide note was not hearsay because it dealt with his state of mind. He maintained the fact the note was self-serving was not determinative if it was being offered to prove state of mind. Addressing the State's arguments, he contended all the notes were found together. Additionally, he asserted the suicide note should be introduced because it was written the day of the assault, noting "he talked about the events of that day." In sum, he believed the note should be introduced to depict his state of mind at the time of the assault. Again, the State asserted the suicide note was not contemporaneous because it was probably written thirty-six hours after the attack and the response letter was written approximately nine months afterwards on August 5, 2002. The trial court again ruled the suicide note was inadmissible.[7]

After the State rested, Tennant moved to proffer testimony by Schwartz–Watts, a forensic psychiatrist. Schwartz–Watts testified primarily about Tennant's mental illness and drug abuse. She opined he was suffering from mental illness when he attacked Victim. Schwartz–Watts also stated someone with his mental illness would interpret Victim's visiting him in jail as an indication that their relationship was ongoing. Additionally, Schwartz–Watts testified Tennant did not believe he could sexually satisfy Victim: "It was his opinion that he could not please her ... [b]ecause she was very experienced. She

---

7. Additionally, at the close of Schwartz–Watts's proffered testimony, the trial court again addressed the admissibility of the suicide note. The trial court determined the "note[] would be introduced literally to prove the truth of the matter to the jury that there was consent, that she agreed to it" and thus, found the suicide note inadmissible.

had been with other people and she had certain preferences, which he didn't share." Schwartz–Watts maintained his inability to please Victim contributed to his poor self-esteem. On cross-examination, in response to a question concerning Tennant's criminal responsibility, she testified:

There is no evidence that any [of] the psychotic beliefs that he has would have prevented him from knowing right from wrong. Like if you ask Mr. Tennant if it is wrong to rape your wife, he would absolutely know that the rape or beating of them was wrong. And there has never been any record that I can tell that he's had recurring impulses to harm, rape, or kill his wife. And so, in my opinion, on that day in time even though he was sick he knew the difference between right and wrong. And he certainly was not having any recurring impulses to rape or harm his wife.

Furthermore, when specifically asked by the trial court if she could testify to any information regarding consent in this matter as a defense, Schwartz–Watts stated: "No. That would certainly—that would be outside the realm of my expertise. My opinion would probably be limited to what his mental state was, could he perceive for the mental illness and his own personality are based on the relationship between him and the victim. I couldn't say."

Following the proffer, the trial court questioned the relevance of Schwartz–Watts's testimony, and Tennant maintained her testimony was relevant to his state of mind and the State's burden of proving criminal intent beyond a reasonable doubt. Additionally, he contended Schwartz–Watts's testimony contradicted Victim's testimony that she did not go see him while he was imprisoned and she maintained the relationship was over. Further, the contradictory testimony was relevant to the nature of the relationship between Victim and Tennant. As a result, the trial court recalled Schwartz–Watts, and asked her if she had an opinion as an expert regarding whether Tennant believed Victim consented to the sexual encounter. Schwartz–Watts replied: "Certainly he believes and he reports to me that he believes it was consensual, but you know, how much of that comes from mental illness and how much of that comes from his being rational, I don't know." Upon further examination by Tennant, Schwartz–Watts testified there was no evidence "that because of a psychiatric disorder"

Tennant could have perceived Victim to have consented. The trial court excluded Schwartz–Watts's testimony in its entirety.

The jury convicted Tennant of first-degree criminal sexual conduct, kidnapping, and ABHAN. The trial court sentenced Tennant to two concurrent terms of thirty years' imprisonment, suspended upon the service of twenty years' imprisonment and five years probation for the criminal sexual conduct and kidnapping convictions. Additionally, the trial court sentenced Tennant to a concurrent term of ten years for the ABHAN conviction. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006). "An abuse of discretion occurs when the conclusions of the trial court either lack evidentiary support or are controlled by an error of law." *Id.* The trial court is given broad discretion in ruling on questions concerning the relevancy of evidence, and its decision will be reversed only if there is a clear abuse of discretion. *State v. Aleksey*, 343 S.C. 20, 35, 538 S.E.2d 248, 256 (2000).

"To warrant reversal based on the admission or exclusion of evidence, the complaining party must prove both the error of the ruling and the resulting prejudice." *State v. White*, 372 S.C. 364, 373, 642 S.E.2d 607, 611 (Ct.App.2007). To prove prejudice, the complaining party must show there is a reasonable probability "that the jury's verdict was influenced by the challenged evidence or lack thereof." *Id.* at 374, 642 S.E.2d at 611.

## LAW/ANALYSIS

### I. Doctor Schwartz–Watts's Testimony

Tennant argues the trial court erred in refusing to admit Doctor Schwartz–Watts's expert testimony about his mental illness because her testimony was probative of his state

of mind and his defense of consent, and effectively impeached Victim on the issue of whether or not she visited him in jail. We disagree.

 "The qualification of an expert witness and the admissibility of the expert's testimony are matters within the trial court's sound discretion." *State v. White*, 372 S.C. 364, 373, 642 S.E.2d 607, 611 (Ct.App.2007). Before expert testimony is admitted, the trial court must determine if the evidence is relevant, reliable, and helpful to the jury. *Id.* at 374, 642 S.E.2d at 612. "If the evidence is reliable, and relevant, the trial [court] should determine if the probative value of the evidence is outweighed by its prejudicial effect." *Id.*

Tennant asserts the exclusion of Schwartz–Watts's testimony was prejudicial because Victim's credibility was critical and Schwartz–Watts's testimony proved Victim was lying about their relationship. Tennant also claims the trial court's refusal to admit Schwartz–Watts's testimony violated his right to present a complete defense. However, the trial court determined Schwartz–Watts's testimony was not relevant to the issues at trial. She testified primarily about Tennant's mental illness, but ultimately opined there was no evidence his psychiatric disorder caused his belief that Victim consented to the sexual encounter. Moreover, Schwartz–Watts testified she believed Tennant was suffering from his mental illness at the time of the assault, but did not state the mental illness prevented him from being able to distinguish right from wrong.

Furthermore, when directly asked by the trial court if she could provide an expert opinion on consent, Schwartz–Watts replied in the negative. As to Tennant's argument that her testimony effectively impeached Victim, the record indicates Schwartz–Watts's basis for thinking Victim visited him at jail came from his medical records and statements. Moreover, Victim did not unequivocally state she did not visit Tennant in jail, but rather stated she did not remember visiting him.

Lastly, Tennant has not effectively established the trial court abused its discretion by finding Schwartz–Watts's testimony was not relevant. He has also failed to present evidence that he suffered prejudice from the exclusion of his mental

health history. Ultimately, Tennant failed to prove there is a reasonable probability that the jury's verdict was influenced by the lack of Schwartz–Watts's testimony. Accordingly, we find the trial court did not err in excluding Schwartz–Watts's testimony.

## II. Suicide Note

Tennant argues the trial court erred in refusing to admit the suicide note because it was probative of his state of mind and relevant to his defense of consent. Additionally, he asserts the suicide note was admissible pursuant to Rule 106, SCRE, the rule of completeness. We disagree.

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), SCRE. "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Rule 801(a), SCRE. "Hearsay is not admissible except as provided by [the South Carolina Rules of Evidence] or by other rules prescribed by the Supreme Court of this State or by statute." Rule 802, SCRE. An exception to the rule against hearsay is a "statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will." Rule 803(3), SCRE.

Rule 106 of the South Carolina Rules of Evidence states: "When a writing, or recorded statement, or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Our supreme court held in *State v. Cabrera–Pena*, 361 S.C. 372, 380, 605 S.E.2d 522, 526 (2004), that when the State elicits portions of a communication made by a defendant, "the rule of completeness requires the defendant be permitted to inquire into the full substance of that conversation."

Here, Tennant's argument that the suicide note is not hearsay because it depicts his state of mind is misplaced.

Rule 803(3) specifically excludes a statement of memory or belief to prove the fact remembered. Rule 803(3), SCRE. Additionally, the suicide note does not pertain to Tennant's state of mind other than to assert his memory of the events of the assault. Accordingly, the note is offered to prove the truth of the matter asserted—that Victim consented to the sexual encounter—and is therefore inadmissible hearsay.

■ Moreover, Tennant's assertion that the rule of completeness requires the admission of the suicide note is erroneous. He sought to introduce the suicide note to put into context the response letter he wrote to Victim almost nine months later. The trial court did not err by rejecting this argument because the contents of the suicide note and the response letter are starkly different, and the writings were not contemporaneous or responsive to one another. Essentially, the two writings are wholly distinct. Accordingly, we find the trial court property excluded the suicide note as inadmissible hearsay.

### III. Rape Shield Statute

■ Tennant argues the trial court erred in refusing to allow him to question Victim and introduce evidence about their unusual sexual history, including "rough sex" and the infliction of pain, because the exclusion of this sexual history evidence denied him his right to present a complete defense. We disagree.

The admission of a victim's sexual conduct is limited by statute:

(1) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct is not admissible in prosecutions under Sections 16–3–615 and 16–3–652 to 16–3–656; however, evidence of the victim's sexual conduct with the defendant or evidence of specific instances of sexual activity with persons other than the defendant introduced to show source or origin of semen, pregnancy, or disease about which evidence has been introduced previously at trial is admissible if the judge finds that such evidence is relevant to a material fact and issue in the case and that its inflammatory or prejudicial nature does not outweigh its

probative value. Evidence of specific instances of sexual activity which would constitute adultery and would be admissible under rules of evidence to impeach the credibility of the witness may not be excluded.

S.C.Code Ann. § 16–3–659.1(1) (2003).

As a threshold matter, it is questionable whether this issue is preserved for our review because, although Tennant requested that the trial court address the admissibility of Victim's sexual history during or following her testimony, Tennant neglected to pursue the issue again.

Nevertheless, addressing the merits, Tennant maintains the evidence of their sexual history was necessary for the jury's understanding of his defense of consent, and to corroborate Schwartz–Watts's testimony that he could not sexually satisfy Victim. However, the proffer contained allegations of specific instances of Victim's sexual conduct, including opinion evidence and reputation evidence. The evidence proffered was not intended to be introduced to show source of origin of semen, pregnancy, or disease. Moreover, the evidence of Victim's sexual history was not relevant to any issue at trial. While Tennant contends Victim preferred "rough sex," there is no evidence they ever engaged in "rough sex." Additionally, the record is void of any evidence the sex between Tennant and Victim on the night of the assault was "rough." Lastly, in Tennant's proffer, he contradicts his assertion he and Victim engaged in "rough sex" by stating he never did anything to hurt her during sex, despite her desires. Thus, the trial court properly excluded the proffered evidence of Victim's sexual history pursuant to the Rape Shield Statute.

## CONCLUSION

Accordingly, Tennant's convictions and sentences are

**AFFIRMED.**

THOMAS and GEATHERS, JJ., concur.