714 S.E.2d 297

**The STATE, Respondent,**

v.

**Roy Otis TENNANT, Petitioner.**

**No. 27027.**

Supreme Court of South Carolina.

Heard June 8, 2011.

Decided Aug. 15, 2011.

Chief Appellate Defender Robert M. Dudek, South Carolina Commission on Indigent Defense, of Columbia, Ernest Charles Grose, Jr., of Greenwood, and Tara Marie Schultz, of Laurens, for Petitioner.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General Harold M. Coombs, Jr., all of Columbia, and Solicitor Jerry W. Peace, of Greenwood, for Respondent.

Justice KITTREDGE.

In this appeal from convictions for criminal sexual conduct in the first degree, kidnapping, and assault and battery of a

high and aggravated nature, Petitioner Roy Otis Tennant challenges the trial court's rulings on several evidentiary issues. In particular, Tennant argues the trial court erred in excluding the testimony of a forensic psychologist, erred in excluding a note written by Tennant and addressed to the victim, and erred in excluding proffered statements regarding the sexual history between the victim and the defendant. We affirm the court of appeals' opinion as modified.

## I.

The allegations against Tennant, according to the victim's testimony, were as follows. The victim was married to Tennant for approximately nine or ten years prior to the incident in question, which occurred on November 26, 2001. However, the victim had lived separately from Tennant since February 2001 and had obtained an order of protection against him. On November 26, 2001, Tennant and the victim attended a hearing regarding their pending divorce. Following the hearing, the victim took some clothes to a laundromat and then went to work. Tennant called the victim several times during her shift, saying that he did not want to divorce her and that he had "something" for her.

After work, the victim proceeded to the home of Tennant's grandmother, who watched the victim's children while the victim worked. Tennant lived at his grandmother's home. Upon the victim's arrival, Tennant approached her car and began accusing her of seeing another man. Tennant entered the vehicle and sat on the passenger side. Suddenly, Tennant placed a rope or cord around the victim's neck and began to strangle her. Tennant then pulled the victim from her car, dragging her on the ground, and placed her in the trunk of her own vehicle. At some point during this attack, the victim passed out.

The victim awoke in the trunk of a car. From the trunk, she managed to push the car's speakers up and out of their proper place, onto the ledge behind the back seat. The car stopped, and Tennant opened the trunk. The victim found that Tennant had taken her to a dark, wooded area. At some point, Tennant duct taped the victim's arms together, but the victim later persuaded him to remove the tape. Tennant

showed the victim a knife and threatened to stab her if she attempted to flee.

Tennant apologized for his actions and explained that he did not want a divorce. Tennant then asked the victim to have sex with him. Under the circumstances, the victim relented. She testified that she did so out of fear for her life. Tennant removed the victim's clothing, spread the clothing from the laundromat on the ground, and had sex with the victim. Tennant then helped the victim get dressed, and he asked her whether she was going to tell the police what had occurred. Tennant told the victim that he would run if the victim reported his actions.

Tennant drove the victim back to his grandmother's house. Upon their arrival at the house, Tennant instructed the victim to go to a bedroom and remain there until she took the children to school the next morning. During the night, Tennant again had sex with the victim. While taking the children to school, the victim flagged down a police officer and reported the incident. According to the victim, Tennant's grandmother's car passed in front of the police station "once or a few times" while the victim's car was parked at the station. Tennant was arrested later that day. According to evidence proffered by Tennant, at the time of his arrest, Tennant had overdosed on prescription medication.

At trial, the State introduced testimony from several witnesses corroborating aspects of the victim's story. For example, the officer to whom the victim first reported the incident confirmed the victim had "marks around her neck." In addition, the nurse who collected evidence from the victim using a sexual assault kit testified that, during the examination, she noticed abrasions on the victim's lower back, breast, shin, knee, and knuckles. She also noticed leaves in the victim's hair and on the victim's body.[1] Moreover, the State introduced several articles of clothing with dirt and grass stains on them, along with a videotape showing the victim's car with the speakers displaced onto the ledge behind the back seat.

The State also introduced—without objection—a letter written by Tennant to the victim approximately eight to nine

---

1. It is undisputed that Tennant's DNA matched the semen recovered during this examination.

months following the attack. In this letter, Tennant apologized for "everything that happened back in November." Pursuant to Rule 106, SCRE, Tennant then sought to introduce a note found by law enforcement when Tennant was served with the arrest warrant on the day following the attack. Tennant has consistently referred to this note as a "suicide note" because he had overdosed on prescription medication around the time it was written. The note makes no mention of suicide, however. Rather, it simply recounts Tennant's view that his sexual encounter with the victim was consensual. The trial court denied Tennant's request to introduce the note.

On cross-examination, Tennant questioned the victim about whether she had visited Tennant in jail after she obtained the order of protection against him. He also questioned her about whether she had Thanksgiving dinner at Tennant's grandmother's house prior to the incident. The victim testified she did not remember either visit. She did admit, however, that she was wearing Tennant's shirt when the attack occurred and that she had retained "three or four" other shirts belonging to Tennant because she "wanted to keep" them.

Once the State rested, Tennant proffered testimony by Dr. Donna Marie Schwartz–Watts, an expert in forensic psychology, regarding Tennant's mental condition and his perception that his relationship with the victim was ongoing. This testimony included references to the purported suicide note. Tennant also proffered evidence regarding the victim's sexual history. The trial court excluded the proffered evidence. Ultimately, Tennant did not testify in his own defense or call any other witnesses. In closing, Tennant argued his relationship with the victim was ongoing and the sexual encounter was consensual.

Tennant was convicted of criminal sexual conduct in the first degree, kidnapping, and assault and battery of a high and aggravated nature. The court of appeals affirmed. *State v. Tennant*, 383 S.C. 245, 678 S.E.2d 812 (Ct.App.2009). We granted Tennant's petition for a writ of certiorari.

## II.

In this appeal, Tennant argues the trial court erred in excluding Dr. Schwartz–Watts' testimony. Tennant further

argues the trial court erred in excluding the purported suicide note. Finally, Tennant argues proffered information regarding the sexual history between the victim and the defendant was not barred by South Carolina's "rape shield" statute—S.C.Code Ann. § 16–3–659.1 (2003)—and therefore, the trial court erred in excluding it. We consider each issue in turn.

## A.

### Testimony of Dr. Schwartz–Watts

Tennant contends that Dr. Schwartz–Watts' testimony was admissible to show Tennant's "state of mind at the time of the alleged crime." In addition, he contends Dr. Schwartz–Watts' testimony should have been admitted for the purpose of impeaching the victim's credibility with regard to whether the victim visited Tennant while he was in jail. We disagree.

In general, a witness may not testify as to matters about which she has no personal knowledge. An exception to this rule permits testimony by an expert witness. Rule 602, SCRE. An expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue" and the witness is duly qualified. Rule 702, SCRE.

In this case, the only states of mind relevant to Tennant's guilt were (a) Tennant's capacity to tell right from wrong; (b) Tennant's ability to conform his actions to the requirements of law; and (c) the issue of consent.[2] Dr. Schwartz–Watts opined that "although [Tennant] was suffering from Schizoaffective Disorder and cocaine dependence at the time of the offense, these illnesses did not prevent him from knowing legal and moral right from wrong, nor did they prevent him from recognizing the wrongfulness of his actions." In addition, she opined that Tennant "did have the capacity to

---

2. As explained in *Gill v. State*, the defense of "diminished capacity" is not recognized in this State. 346 S.C. 209, 220, 552 S.E.2d 26, 32 (2001). Even if diminished capacity could have been a defense, Tennant repeatedly disclaimed any desire to set forth a diminished capacity defense, and Dr. Schwartz–Watts offered no evidence that would support a diminished capacity theory in this case. Specifically, she testified there was "no evidence that *because of a psychiatric disorder* ... [Tennant] could have perceived it to be consent." (Emphasis added).

12

conform his conduct to the requirements of the law." Thus, the only state of mind left in contention was the matter of consent.

As Dr. Schwartz–Watts recognized, the issue of consent was a matter "outside the realm of [her] expertise." Nonetheless, Tennant attempted to use the doctor as a conduit for the introduction of his own statements regarding his belief that the victim consented to their encounter. For example, Dr. Schwartz–Watts testified Tennant reported to her that he believed the sex was consensual. These statements were inadmissible hearsay. *See* Rule 803(3), SCRE.

Tennant also sought to use Dr. Schwartz–Watts to introduce his out-of-court assertions that the victim had visited him in jail after having obtained an order of protection against him. These assertions were made to another doctor and recorded in that doctor's notes. Dr. Schwartz–Watts had no personal knowledge of the victim's alleged visits with Tennant, and this factual issue required no special expertise. Thus, the testimony was properly excluded. Rule 602, SCRE (requiring a witness other than an expert to have personal knowledge of the matters testified to); *cf. State v. Douglas*, 380 S.C. 499, 501–03 & n. 2, 671 S.E.2d 606, 608–09 & n. 2 (2009) (holding a forensic interviewer's personal observations of alleged victims did not require specialized knowledge, and therefore, qualification as an expert was unnecessary).

In sum, because Dr. Schwartz–Watts could offer no "scientific, technical, or other specialized knowledge" that would assist the jury in deciding the issue of consent, and because she had no personal knowledge regarding the factual issues raised by Tennant, the trial court did not abuse its discretion in excluding Dr. Schwartz–Watts' testimony. *See State v. Pagan*, 369 S.C. 201, 208, 631 S.E.2d 262, 265 (2006) ("The admission of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion.").

## B.

### The Purported Suicide Note

Tennant's second and third issues on appeal address the admissibility of the purported suicide note. As with any issue

regarding the admissibility of evidence, we review the trial court's ruling for abuse of discretion. *Id.*

The purported suicide note read as follows:

[Victim]

You told the police that I raped you and you know I did not you told me that you wanted to make love to me from the first day I got out of jail and you hadn't [al]ready because you said I may try and use it against you in our divorce I asked you did you want to make love to me and you said yes and started kissing me[.]

### 1. Rule 106, SCRE

■ Tennant argues the trial court erred in excluding the purported suicide note because, pursuant to Rule 106, SCRE, it should have been admitted as a matter of "fairness" once the State introduced a letter in which Tennant apologized to the victim. We disagree. However, because the court of appeals' opinion suggests an improper standard for the application of Rule 106, we affirm the court of appeals' opinion as modified.

The apologetic letter introduced by the State read in relevant part as follows:

[Victim]

Hey you just can't imagine how happy I was to get your letter. I understand exactly what you [meant] and in response to your letter, I want you to know that I am very deeply sorry for everything that happened back in November and I pray desperately each night that the Lord will help you forgive me and put this behind us an[d] ease your pain. All I can do right now is pray. And its [sic] very important to me that you accept my apology.... [Y]ou will find that the spirit of the Lord will convict you to forgive me for what happened. There are a lot of things that I want to openly express my fe[e]lings about you and the heart of all of this confu[sion]. But to write you a letter explaining fe[e]lings and emotions would may well do more harm than good. Thats [sic] why I haven't done it [al]ready.... [Victim] I need you to forgive me for more than one reason but two. One is because I am real[l]y and tru[ly] sorry for what happened and unless I fe[e]l that you have forgiven me

it will be hard for me to be at peace with myself. And the second reason is because I want to do what God expects me to do. . . .

. . . .

You ask me how can I talk about the Gospel of Jesus Christ after doing such a horrible thing.

Ask someone that [sic] knows the word of God. . . .

Saul once killed Christians . . . yet God found favor with Saul. . . .

According to the victim, this letter was one of a series of three letters. The first letter was written by Tennant to the victim; in that letter, Tennant discussed his belief in God and his desire to be the victim's friend. The victim responded with a letter expressing that she "couldn't understand how he could bring God out of his mouth after he did what he did, [and] wouldn't even tell [her] . . . that he was sorry for doing what he done." The apologetic letter quoted above was Tennant's response to the victim. The purported suicide note, on the other hand, was written at least eight months prior to this three-letter exchange. Moreover, the "suicide note" was a unilateral statement by Tennant; it was not part of an ongoing conversation between Tennant and the victim.

Rule 106 provides:

When a writing, or recorded statement, or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The court of appeals found "[t]he trial court did not err by rejecting [Tennant's Rule 106 argument] because the contents of the suicide note and the response letter are starkly different, and the writings were not contemporaneous or responsive to one another."

■ Rule 106 does not require that the writings at issue be written contemporaneously. Rather, the temporal element of Rule 106 concerns the order of proof. *State v. Taylor*, 333 S.C. 159, 170–71, 508 S.E.2d 870, 876 (1998) ("Rule 106 . . . is a procedural device governing the *timing* of completion evidence; the Rule is 'primarily designed to affect the order of

proof.' " (emphasis added) (quoting *U.S. v. Walker*, 652 F.2d 708, 713 (7th Cir.1981))). Moreover, Rule 106 does not require that the writings at issue be "responsive to one another." The plain language of the rule permits introduction of "any other part **or any other writing** . . . which ought in fairness to be considered contemporaneously." (Emphasis added). The standard here is "fairness," not responsiveness. *See generally* Fed.R.Evid. 106 advisory committee's note (1972 proposed rules) ("The [corresponding federal] rule is based on two considerations. The first is the misleading impression created by taking matters out of context. The second is the inadequacy of repair work when delayed to a point later in the trial."). In sum, the court of appeals erred to the extent it upheld the trial court's exclusion of the purported suicide note on the ground that the note was not written contemporaneously with, or in response to, the apologetic letter introduced by the State.

Nevertheless, the trial court did not abuse its discretion in denying Tennant's request to admit the purported suicide note pursuant to Rule 106. Tennant's note disclaiming responsibility for the alleged crime, while relevant, was not so inextricably connected to the letter introduced by the State that its omission was patently unfair. Thus, we defer to the trial court's exercise of discretion.

We turn now to the question of whether the purported suicide note was admissible via an exception to the hearsay rule.

### 2. Hearsay

Tennant further argues the purported suicide note was admissible because it was probative of his state of mind and of the issue of consent. We disagree.

The "state of mind" exception to the hearsay rule is set forth in Rule 803(3), SCRE:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(3) Then Existing Mental, Emotional, or Physical Condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent,

plan, motive, design, mental feeling, pain, and bodily health), **but not including a statement of memory or belief to prove the fact remembered or believed** unless it relates to the execution, revocation, identification, or terms of declarant's will.

(Emphasis added).

In the purported suicide note, Tennant recounted that the victim consented to their sexual encounter. This statement of Tennant's memory regarding his sexual encounter with the victim was offered to prove the truth of the matter asserted—that his memory was correct. Therefore, the note was hearsay. The note was properly excluded according to the plain language of Rule 803(3) because it was "a statement of memory or belief [offered] to prove the fact remembered or believed." As we explained in *State v. Garcia:*

> The purpose of th[e] exclusion [in Rule 803(3) ] is "to avoid the virtual destruction of the hearsay rule which would otherwise result from allowing state of mind, provable by a hearsay statement, to serve as a basis for an inference of the happening of the event which produced the state of mind." Advisory Committee Note to Rule 803(3), FRE. Consequently, while the present state of the declarant's mind is admissible as an exception to hearsay, **the reason for the declarant's state of mind is not.** *United States v. Cohen,* 631 F.2d 1223, 1225 (5th Cir.1980) ("But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind. **If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—'I'm scared'—and not belief— 'I'm scared because [someone] threatened me'.**").

334 S.C. 71, 76, 512 S.E.2d 507, 509 (1999) (emphasis added). Accordingly, Tennant could not introduce the note for the purpose of showing that the victim wanted to make love to him.[3]

---

3. To the extent Tennant contends the note was not hearsay because it was offered for the purpose of showing his state of mind (rather than for the truth of the matters asserted), we note that Tennant's state of

For these reasons, we hold the trial court did not abuse its discretion in excluding the purported suicide note. We affirm the court of appeals' decision as modified in order to clarify the proper analysis of Rule 106, SCRE.

## C.

### Rape Shield

Last, Tennant argues the court of appeals erred in upholding the trial court's determination that South Carolina Code section 16–3–659.1 barred any evidence regarding the sexual history between the victim and Tennant. We agree. Nevertheless, because the proffered testimony was not relevant, we affirm as modified.

 Statutory interpretation is a question of law. *See Bryant v. State*, 384 S.C. 525, 529, 683 S.E.2d 280, 282 (2009) (citing *Catawba Indian Tribe of S.C. v. State*, 372 S.C. 519, 524, 642 S.E.2d 751, 753 (2007)). "We are free to decide a question of law with no particular deference to the circuit court." *Catawba Indian Tribe*, 372 S.C. at 524, 642 S.E.2d at 753. "A statute's language must be construed in light of the intended purpose of the statute. Whenever possible, legislative intent should be found in the plain language of the statute itself." *State v. Gaines*, 380 S.C. 23, 33, 667 S.E.2d 728, 733 (2008).

South Carolina Code section 16–3–659.1(1) provides:

Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct is not admissible in prosecutions under Sections 16–3–615 and 16–3–652 to 16–3–656; however, evidence of the victim's sexual conduct with the defendant or evidence of specific instances of sexual activity with persons other than the defendant introduced to show source or origin of semen, pregnancy, or disease about which evidence has been introduced previous-

---

mind at or near the time of his arrest was not at issue. This self-serving declaration of innocence, made after the crime was complete and after Tennant became aware that the victim had reported his actions to the police, was not probative of Tennant's state of mind at the time of the sexual encounter. Thus, if the note was not hearsay, it also was not relevant.

ly at trial is admissible if the judge finds that such evidence is relevant to a material fact and issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value. Evidence of specific instances of sexual activity which would constitute adultery and would be admissible under rules of evidence to impeach the credibility of the witness may not be excluded.

This is commonly known as the "rape shield" statute.

The court of appeals held the phrase "introduced to show source or origin of semen, pregnancy, or disease" operated to preclude evidence of the victim's sexual conduct *with the defendant* unless introduced to show the source or origin of semen, pregnancy, or disease. Tennant argues—and we agree—that this construction was improper.

By our reading, the word "or" separating evidence of the victim's conduct with the defendant from evidence of the victim's conduct with other persons has the effect of creating two distinct forms of permissible evidence: (1) evidence of the victim's conduct with the defendant; and (2) evidence of specific instances of the victim's conduct with a third party introduced for the purpose of showing the source or origin of semen, pregnancy, or disease. Thus, the requirement of an evidentiary nexus to "source or origin of semen, pregnancy, or disease" applies only to evidence of the victim's sexual conduct with persons other than the defendant. The rape shield statute imposes no such limitation concerning a victim's sexual conduct with a defendant.

Many jurisdictions separate these two forms of permissible evidence in their rape shield statutes. *See, e.g.,* Fed.R.Evid. 412(b) ("In a criminal case, the following evidence is admissible, if otherwise admissible under these rules: (A) evidence of specific instances of sexual behavior . . . offered to prove that a person other than the accused was the source of semen, injury or other physical evidence; (B) evidence of specific instances of sexual behavior . . . with respect to the person accused . . . offered by the accused to prove consent or by the prosecution. . . ."); Colo.Rev.Stat. § 18–3–407(1) (2010) (creating a presumption that evidence of a victim's sexual conduct is "irrelevant" except "(a) Evidence of the victim's . . . sexual conduct with the actor; (b) Evidence of specific instances of

sexual activity showing the source or origin of semen ... or any similar evidence of sexual intercourse offered for the purpose of showing that the act or acts charged were or were not committed by the defendant."); N.J. Stat. Ann. § 2C:14–7 (West 2005);[4] Va.Code Ann. § 18.2–67.7(A) (2009) (amended 2011) (listing as permissible: "1. Evidence offered to provide an alternative explanation for physical evidence of the offense charged ... limited to evidence designed to explain the presence of semen, pregnancy, disease, or physical injury ...; or 2. Evidence of sexual conduct between the complaining witness and the accused offered to support a contention that the alleged offense was not accomplished by force, threat or intimidation....").

Montana's rape shield statute is particularly similar to our own. The Montana Code provides:

> Evidence concerning the sexual conduct of the victim is inadmissible in prosecutions under this part except evidence of the victim's past sexual conduct with the offender or evidence of specific instances of the victim's sexual activity to show the origin of semen, pregnancy, or disease that is at issue in the prosecution.

Mont.Code Ann. § 45–5–511(2) (2009). The Montana Supreme Court interpreted this statute to permit two distinct types of evidence: (a) evidence of "conduct involv[ing] the defendant as a participant" and (b) "where an issue exists as to the origin of semen, pregnancy or disease ... conduct [that] is probative on that issue." *State ex rel. Mazurek v. District Court,* 277 Mont. 349, 922 P.2d 474, 477 (1996). We find these authorities persuasive.

 For these reasons, we find that section 16–3–659.1 does not bar evidence of a victim's sexual conduct with a defendant, provided that such evidence is otherwise admissible. The trial court and court of appeals erred in limiting evidence of this kind to circumstances in which it is introduced to show the source or origin of semen, pregnancy, or disease. Nonetheless, Tennant was not prejudiced the error.

 Tennant's proffered evidence included a wide range of allegations regarding the victim's sexual behavior and her

---

4. *See infra* n. 5.

relationship with Tennant. However, the only allegations at issue in this appeal are those concerning sexual conduct between Tennant and the victim. *See* Rule 208(b)(1)(B), SCACR ("Ordinarily, no point will be considered which is not set forth in the statement of the issues on appeal."). Specifically, Tennant argues the jury was deprived of evidence that the victim wanted Tennant "to hurt her" in order to achieve sexual satisfaction and that Tennant refused to do so. Tennant contends this evidence was relevant to his defense of consent.

There is nothing in the record to suggest that the sexual conduct that formed the basis of the crimes charged involved "rough sex" or an attempt to sexually satisfy the victim through the infliction of pain. The physical examination of the victim on the day following the attack did not reveal any signs of vaginal trauma. The victim testified to violence while Tennant choked her and placed her in the trunk of her vehicle, but there is no evidence that Tennant engaged in violence during the sexual activities that followed. Rather, the victim testified she peacefully submitted to Tennant's request for sex out of fear for her life. In short, evidence that the victim might have enjoyed "rough sex" with Tennant during their marriage did not tend to show that the victim consented to the sexual encounter on the night in question.[5]

Because we find the proffered evidence regarding sexual conduct between Tennant and the victim was irrelevant, we find Tennant was not prejudiced by the trial court's error in interpreting section 16–3–659.1. *See Taylor*, 333 S.C. at 172, 508 S.E.2d at 876 ("[I]n order for this Court to reverse a case based on the erroneous admission or exclusion of evidence,

---

5. The potential relevance of evidence regarding a victim's sexual conduct with a defendant is aptly explained in New Jersey's rape shield statute, which provides in relevant part:

 c. Evidence of previous sexual conduct with persons other than the defendant . . . shall not be considered relevant unless it is material to proving the source of semen, pregnancy or disease.

 d. Evidence of the victim's previous sexual conduct with the defendant shall be considered relevant if it is probative of whether a reasonable person, knowing what the defendant knew at the time of the alleged offense, *would have believed that the alleged victim freely and affirmatively permitted the sexual behavior complained of.*

 N.J. Stat. Ann. § 2C:14–7 (emphasis added).

prejudice must be shown."); Rule 220(c), SCACR ("The appellate court may affirm any ruling, order, decision or judgment upon any ground(s) appearing in the Record on Appeal.").

## III.

In sum, we agree that the court of appeals' opinion requires clarification in two respects: (1) Rule 106, SCRE, does not require that the writings at issue be created contemporaneously or in response to one another; and (2) South Carolina Code section 16–3–659.1 (the rape shield statute) does not bar evidence of sexual conduct between the victim of a sexual crime and the accused, so long as that evidence is otherwise admissible. We find no prejudice from these errors, and therefore, we uphold Tennant's convictions and sentence.

**AFFIRMED AS MODIFIED.**

TOAL, C.J., PLEICONES, BEATTY and HEARN, JJ., concur.