# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Mitzi S. Turner, Respondent,

v.

Richard Charles Thomas and John Doe, Defendants,

v.

Charles Louis Garrard, Jr., Third Party Respondent,

Of whom Richard Charles Thomas is the Appellant.

Appellate Case No. 2017-000725

Appeal From Greenville County
W. Marsh Robertson, Family Court Judge

Opinion No. 5765
Heard September 11, 2019 – Filed August 19, 2020

**AFFIRMED**

Bruce Wyche Bannister, and Luke Anthony Burke, both of Bannister, Wyatt & Stalvey, LLC, of Greenville, for Appellant.

Kirby Rakes Mitchell, of S.C. Legal Services, and Robert M. Rosenfeld, of Robert M. Rosenfeld Attorney-at Law, both of Greenville, for Third Party Respondent.

Mitzi S. Turner, of Seneca, pro se.

**WILLIAMS, J.:** In this domestic relations matter, Richard Thomas (Grandfather) appeals the family court's findings, arguing the family court erred in (1) finding Charles Garrard, Jr. (Garrard) is a de facto custodian of the minor child (Child), (2) admitting improper hearsay evidence, (3) finding Garrard is a psychological parent to Child, (4) awarding custody of Child to Mitzi Turner (Grandmother), (5) requiring Grandfather to pay Grandmother's and Garrard's attorneys' fees, and (6) requiring Grandfather to pay a greater share of the guardian ad litem's (GAL) fees. We affirm.

## FACTS/PROCEDURAL HISTORY

Child's mother, Ashley Thomas (Mother), began dating Garrard when Mother was seven months pregnant with Child. Child was born in January 2013, and Child's biological father has never been identified. After Child's birth, Mother and Child resided with Grandmother—Mother's mother—for approximately four months until Child and Mother moved into a home with Garrard. Mother and Child resided with Garrard until Mother passed away in an automobile accident on June 1, 2015. Following Mother's death, Child continued to reside with Garrard for approximately three weeks, and then Grandmother and Grandfather[1] informed Garrard that Child would reside with Grandmother.

On June 22, 2015, Grandmother filed a complaint seeking primary custody of Child. With Grandfather's consent, the family court issued an ex parte order granting Grandmother temporary custody and noting Grandmother would not object to sharing secondary joint custody with Grandfather. On June 26, 2015, Garrard filed a motion to intervene and a motion for temporary relief, requesting temporary custody of Child, and the family court subsequently issued an order adding Garrard as a third party defendant in the action with the consent of Grandmother's attorney. On July 9, 2015, the family court issued a temporary order (the First Temporary Order) granting Grandmother and Grandfather joint custody of Child, giving Grandmother primary physical custody and primary decision making authority for Child, granting Garrard eight hours of visitation on alternate Sundays, and appointing a GAL. On July 14, 2015, Garrard filed an answer, counterclaim, and cross-claim seeking primary or secondary custody of Child. Grandfather subsequently filed a motion requesting termination of Garrard's

---

[1] Grandfather is Mother's father. Grandmother and Grandfather divorced when Mother was a young child.

visitation. On November 20, 2015, the family court issued a temporary order (the Second Temporary Order), granting Garrard visitation as follows: eight hours on Wednesdays, eleven hours on alternate Sundays, three hours on Christmas Eve, and forty-five minutes on Christmas morning. The Second Temporary Order also provided Grandfather would have visitation with Child one weekend per month from Friday at 6 P.M until Sunday at 6 P.M. and for eight hours one day each week that Grandfather and Grandmother agreed upon. On December 1, 2015, Grandmother filed an amended complaint seeking sole custody of Child with Grandfather and Garrard having visitation with Child. Grandfather filed an amended answer, counterclaim, and cross-claim seeking sole custody of Child, visitation for Grandmother, and dismissal of Garrard's request for custody or visitation. Garrard filed an answer, counterclaim, and cross-claim to Grandmother's amended complaint, seeking an order declaring he is Child's psychological parent and granting him shared custody of Child with Grandmother.

The family court held a final merits trial from January 4–6, 2017. On January 27, 2017, the family court issued a final order (the Final Order) in which it (1) found Garrard was a de facto custodian and a psychological parent to Child, (2) granted Grandmother custody, (3) granted Garrard and Grandfather visitation, (4) ordered Grandfather to reimburse Grandmother and Garrard for a portion of their attorneys' fees, and (5) required Grandfather to pay fifty percent of the GAL's fees and Grandmother and Garrard to each pay twenty-five percent. The family court subsequently denied Grandfather's motion to alter or amend the Final Order. This appeal followed.

## ISSUES ON APPEAL

I.    Did the family court err in finding Garrard is a psychological parent of Child?

II.   Did the family court err in admitting improper hearsay evidence?

III.  Did the family court err in finding Garrard is ade facto custodian of Child?

IV.   Did the family court err in awarding primary custody of Child to Grandmother?

V.    Did the family court err in requiring Grandfather to pay Grandmother's and Garrard's attorneys' fees?

VI.    Did the family court err in requiring Grandfather to pay a greater share of the GAL's fees?

**STANDARD OF REVIEW**

The appellate court reviews a family court's evidentiary or procedural rulings using an abuse of discretion standard. *Stoney v. Stoney*, 422 S.C. 593, 594 n.2, 813 S.E.2d 486, 486 n.2 (2018) (per curiam). Appellate courts review all other family court matters de novo. *Id*. at 594, 813 S.E.2d at 486. De novo review allows the appellate court to make its own findings of fact, but the appellate court is not required to ignore the family court's superior position to make credibility determinations. *Lewis v. Lewis*, 392 S.C. 381, 384–85, 709 S.E.2d 650, 651–52 (2011). Under de novo review, the "appellant retains the burden to show that the family court's findings are not supported by a preponderance of the evidence; otherwise, the findings will be affirmed." *Ashburn v. Rogers*, 420 S.C. 411, 416, 803 S.E.2d 469, 471 (Ct. App. 2017).

**LAW/ANALYSIS**

**I.    Psychological Parent**

Grandfather argues the family court erred in finding Garrard is a psychological parent to Child and in considering evidence from after the initiation of the action to do so. We disagree.

In child custody cases, the controlling considerations are the welfare and best interests of the child. *Bojilov v. Bojilov*, 425 S.C. 161, 176, 819 S.E.2d 791, 800 (Ct. App. 2018). "There is a rebuttable presumption that it is in the best interest of any child to be in the custody of its biological parent." *Marquez v. Caudill*, 376 S.C. 229, 240–41, 656 S.E.2d 737, 743 (2008). "Under the penumbra of custody is the lesser included right to visitation." *Middleton v. Johnson*, 369 S.C. 585, 594, 633 S.E.2d 162, 167 (Ct. App. 2006). In this case, there is not a biological parent seeking custody of Child, but this court has found that to safeguard the best interests of children, "the General Assembly has recognized that in certain circumstances, persons who are not a child's parent or legal guardian may be proper parties to a custody proceeding." *Id*.; *see* S.C. Code Ann. § 63-3-530(20) (2010) (granting the family court exclusive jurisdiction to award "any other proper person or institution" custody of a child).

Before *Middleton*, no South Carolina court had definitively determined a party was a psychological parent, and thus, no South Carolina court had granted custody or

visitation to a psychological parent.  In *Middleton*, the court noted that although our courts recognized the existence of the psychological parent doctrine in *Moore v. Moore*[2] and *Dodge v. Dodge*,[3] our courts had never provided for how a party could establish that he or she was a child's psychological parent.  369 S.C. at 595, 633 S.E.2d at 168.  Therefore, the court examined how other states make psychological parent determinations, and it adopted the four-prong test used by the Supreme Court of Wisconsin, which requires a petitioner seeking to demonstrate the existence of a psychological parent-child relationship to show:

> (1) that the biological or adoptive parent[s] consented to, and fostered the petitioner['s] formation and establishment of a parent-like relationship with the child;
>
> (2) that the petitioner and the child lived together in the same household;
>
> (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; [and]
>
> (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature.

*Marquez*, 376 S.C. at 241–42, 656 S.E.2d at 743 (first and third alterations in original) (quoting *Middleton*, 369 S.C. at 596–97, 633 S.E.2d at 168); *see In re Custody of H.S.H.-K.*, 533 N.W.2d 419, 421 (Wis. 1995).  The court in *Middleton*

---

[2] 300 S.C. 75, 80–81, 386 S.E.2d 456, 459 (1989) (finding a psychological parent-child relationship may have existed between the child and his third party custodians, but ordering the return of the child to his biological father because the mere existence of such a relationship was inadequate to justify awarding the third parties permanent custody over the child's fit, biological parent)

[3] 332 S.C. 401, 413, 415, 505 S.E.2d 344, 350–51 (Ct. App. 1998) (finding that although the children had a loving relationship with their stepfather and grandparents after their mother's death, their attachment did not rise to the level of a psychological parent-child relationship, and, therefore, the family court erred in not awarding the children's biological father custody).

also recognized "that when both biological parents are involved in the child's life, a third party's relationship with the child could never rise to the level of a psychological parent, as there is no parental void in the child's life." 369 S.C. at 598, 633 S.E.2d at 169.

## A.    Relevant Time Period for the Psychological Parent Determination

Grandfather asserts the family court erred in considering evidence of Garrard's relationship with Child following the initiation of this action. We find this argument is without merit as there is no indication the family court considered such evidence when it found Garrard is Child's psychological parent.

In making its determination that Garrard is Child's psychological parent, the family court cited to circumstances which necessarily occurred prior to the initiation of the action because the evidence pertained to the time period when Mother was still alive and living with Garrard and Child.  Furthermore, during the trial, Grandfather objected to a witness agreeing Garrard treated Child like a daughter, arguing Garrard had to prove there was a parental relationship before the initiation of the action to establish that he is a psychological parent.  The family court overruled the objection and stated it would allow testimony of Child and Gerrard's relationship after the action was filed because it would be relevant to a custody determination if Garrard was ultimately found to be a psychological parent.[4]

## B.    Psychological Parent

Grandfather argues the family court erred in finding Garrard is a psychological parent to Child.  Grandfather admits Garrard lived with Child for approximately two years, but he avers the other prongs of psychological parenthood were not met.

### i.    Mother's Consent to and Fostering of the Relationship

Grandfather argues Mother did not consent to or foster Garrard's relationship with Child.  We disagree.

The requirement that the biological parent consented to and fostered the formation and establishment of a parent-like relationship with the child is "critical because it

---

[4] Because we find the family court did not consider evidence from after the action was filed when it determined Garrard is a psychological parent to Child, we decline to address whether the family court may properly consider evidence of the existence of a psychological parent-child relationship arising after an action is filed.

makes the biological or adoptive parent a participant in the creation of the psychological parent's relationship with the child." *Middleton*, 369 S.C. at 597, 633 S.E.2d at 168 (quoting *V.C. v. M.J.B.*, 748 A.2d 539, 552 (N.J. 2000)). "This factor recognizes that when a legal parent invites a third party into a child's life, and that invitation alters a child's life by essentially providing him with another parent, the legal parent's rights to unilaterally sever that relationship are necessarily reduced." *Id*. at 597, 633 S.E.2d at 169.

*Middleton* involved an appeal of the family court's finding that Middleton—the child's mother's ex-boyfriend—had no right to petition for visitation with the child. *Id.* at 588–89, 593, 633 S.E.2d at 164, 166. This court found Middleton was the child's psychological parent and indicated the first prong was met because there was evidence the mother invited Middleton to act as a father to the child. *Id*. at 599, 633 S.E.2d at 170. In that case, the mother sent pictures of the newborn child to Middleton that insinuated he was the child's father, the mother and Middleton created a schedule so he could pick up the child from school and attend field trips, Middleton paid for one-half of the child's daycare, and he was listed on the child's daycare registration. *Id*. When the child turned three years old, the child began staying with Middleton for one-half of every week, Middleton took the child to doctor and dentist appointments, and the child attended family reunions and functions with Middleton. *Id*. Finally, this court found the child spent a considerable amount of time with Middleton for the first ten years of the child's life, and the mother, "by ceding over a large part of her parental responsibilities to Middleton, fostered the parent-child bond between Middleton and [the child]." *Id.* at 599–60, 633 S.E.2d at 170.

*Marquez* involved an appeal of the family court's award of custody to the child's stepfather instead of the child's maternal grandmother following the death of the child's mother and the relinquishment of parental rights by the child's father. 376 S.C. at 233–34, 656 S.E.2d at 739. In determining it was in the child's best interest for the stepfather to have custody, our supreme court found the stepfather was a psychological parent. *Id*. at 239–45, 656 S.E.2d at 742–45. The court found the mother consented to and fostered a parent-like relationship between the child and the stepfather when shortly after the child's birth, the mother and the stepfather moved in together, later married, and agreed to share joint custody of the child after separating. *Id*. at 244, 656 S.E.2d at 744. The court noted stepfather did not adopt the child—initially because mother did not want to lose child support, but after the support ceased, there was some evidence the mother was opposed to the stepfather adopting the child. *Id*.

Upon our de novo review, we find Mother consented to and fostered a parent-like relationship between Garrard and Child. The identity of Child's father is unknown, and he was never present in Child's life. Mother's half-sister and Grandmother testified Garrard was the first person Mother let hold Child after Child's birth;[5] there was testimony that Child, Mother, and Garrard resided together as a family unit for two of the first two and one-half years of Child's life;[6] and multiple witnesses acknowledged Garrard was the only father figure Child ever had in her life. One witness testified Mother always recognized Garrard on Father's Day, and multiple witnesses agreed Mother promoted and fostered a parent-child relationship between Garrard and child. There was also testimony that Child has referred to Garrard as "daddy" since she began talking and that Mother supported and promoted this and referred to Garrard as Child's "daddy." When Mother completed the registration form for Child's daycare, she listed both herself and Garrard as Child's parents/guardians. There is also evidence Mother treated Garrard's family as extended family because Garrard and his family attended Child's birthday parties and Mother and Child attended Garrard's family gatherings. Other evidence, discussed below, indicates Mother consented to a parent-like relationship between Garrard and Child by splitting parental duties with Garrard. *See infra* Part I(B)(ii); *Middleton*, 369 S.C. at 600, 633 S.E.2d at 170 ("[The m]other by ceding over a large part of her parental responsibilities to Middleton, fostered the parent-child bond between Middleton and [the child]").

Based on the foregoing, we find Mother consented to and fostered the formation of a parent-like relationship between Garrard and Child. Therefore, we find the family court did not err in finding this prong was met.

### ii. Obligations of Parenthood

Grandfather asserts Garrard did not assume the obligations of parenthood for Child. We disagree.

In *Middleton*, this court found this prong was met because Middleton paid for the child's preschool, paid mother $250 per month when the child was in the mother's custody, and established a savings account for the child's education. *Middleton*, 369 S.C. at 600, 633 S.E.2d at 170. Middleton also spent quality time with the

---

[5] Grandfather and his mother, Joan Arms, testified Arms was the first person Mother allowed to hold Child.

[6] This also satisfies the second prong requiring the petitioner and child live together in the same household. *See Middleton*, 369 S.C. at 596, 633 S.E.2d at 168.

child by taking the child to movies, amusement parks, and church. *Id*. This court noted the child's biological father only visited the child once and found that the parental void left by the child's biological father coupled with Middleton's assumption of parental obligations compelled the court to find that Middleton undertook the responsibilities necessary to meet this prong. *Id*.

In *Marquez*, the court noted that following the child's mother's death, the child's stepfather clearly assumed the obligations of parenthood. 376 S.C. at 244, 656 S.E.2d at 745. However, the court indicated the evidence was not clear as to whether the stepfather met this prong before the mother's death because some testimony indicated the stepfather preferred his own daughter to the child, and the evidence showed the child's mother, not the stepfather, ensured the child received counseling before her death. *Id*. Nevertheless, other testimony indicated the stepfather was in charge of both children and that he cooked for them and disciplined them. *Id*. There was no evidence of financial support, but the court assumed both the stepfather and the mother provided financial support to the child because they were both employed and married, and they all lived in the same household. *Id*. at 244–45, 656 S.E.2d at 745. Thus, the court ultimately found this prong was met. *Id*. at 245, 656 S.E.2d at 745.

We find Garrard met this prong. Like in *Middleton*, there was a parental void left by Child's biological father. Garrard was present for Child's entire life, and he resided with Mother and Child for approximately two years before Mother's death. Although Grandfather, Arms, and Tony Turner—Grandmother's husband—each testified they provided for Mother financially by giving her money to pay her bills or buy groceries, Garrard averred he contributed financially to the Child's care by sharing the costs of groceries and miscellaneous expenses such as toys, gifts, haircuts, and diapers. Garrard also testified he spent most of his income on the household and he paid the power, gas, and water bills; the car insurance on both his car and Mother's car; and the renter's insurance for their home. Although Mother paid the water bill once or twice, in return, Garrard stated he paid another bill or bought groceries. Although Turner averred Mother told him Garrard did not provide for Mother and Child financially, he admitted he had no personal knowledge that Garrard was not contributing his income to the household. Based on the foregoing, we find the record supports that despite assistance from Mother's family members, Garrard, too, made significant contributions to Child's care and the household. [7]

---

[7] Grandfather specifically argues that it is not possible that Garrard financially supported Child because Garrard cannot currently meet his monthly bills even

There is also evidence that Garrard took significant responsibility for Child's care, education, and development. After Child was hospitalized, Garrard took time off from work to care for Child and give her medications three times per day intravenously. Grandmother, Arms, and Garrard testified that on Garrard's two days off from work each week, he took care of Child.[8] Arms testified that when Child began going to daycare two days per week, Garrard took her to daycare. Garrard stated he worked with Mother to contribute to Child's education by reading to Child every night and working with Child on her alphabet, colors, and numbers. Garrard agreed that he shared as much responsibility for Child as Mother did, and he stated he and Mother shared household responsibilities such as cooking, cleaning, watching Child, changing Child's diapers, playing with Child, and feeding Child. Furthermore, several other witnesses agreed Mother and Garrard shared household responsibilities and the responsibilities of raising Child.

We find the parental void left by Child's biological father coupled with the parental obligations assumed by Garrard indicate Garrard undertook the responsibilities necessary to meet this prong. *See Middleton*, 369 S.C. at 600, 633 S.E.2d at 170 (finding the parental void left by the child's biological father coupled with Middleton's assumption of parental obligations compelled the court to find Middleton met this prong). Thus, the family court did not err in finding this prong was met.

---

though he is no longer providing for Child. To support this assertion, Grandfather cites to Garrard's testimony that indicates his current monthly expenditures exceed (1) his monthly expenditures when he resided with Mother and (2) his current monthly income. We find this argument is without merit because, as previously indicated, Garrard testified he and Mother split the household bills and expenses. Following Mother's death, we find it is reasonable Garrard's monthly expenditures would increase due to Mother's lack of financial contribution to the household bills and expenses. Thus, Garrard's inability to meet his monthly bills now does not serve as evidence that it was previously impossible for him to provide for Child.

[8] Grandfather argues Garrard admitted when he could no longer take care of Child, he called Mother to make other arrangements instead of calling someone directly. Grandfather asserts this is more consistent with a baby-sitter's actions than a parent-like figure's actions. However, based on our review of the record, we find this argument is without merit. When Grandfather's attorney raised these allegations at the trial, Garrard denied the allegations. Furthermore, Arms testified if something came up on Garrard's day off and he needed her to care for Child, he called Arms directly.

### iii.    Sufficient Length of Time

Grandfather argues Garrard was not in a parental role for a length of time sufficient to establish a bonded parental relationship with Child.  We disagree.

In *Middleton*, this court emphasized the importance of this prong and found "inherent in the bond between child and psychological parent is the risk of emotional harm to the child should the relationship be [. . .] curtailed or terminated."  369 S.C. at 599, 633 S.E.2d at 169 (quoting *In re E.L.M.C.*, 100 P.3d 546, 560 (Colo. App. 2004)).  This court found this prong was met and noted the record revealed the child thought of Middleton as a father for ten years and suffered greatly in Middleton's absence.  *Id*. at 600, 633 S.E.2d at 170.  This court also pointed to the court-appointed therapist's opinion that (1) Middleton was a psychological parent and (2) the emotional attachment between the child and Middleton was so strong that the child felt a sense of loss after not seeing Middleton for two years.  *Id*.  The therapist also noted that a severance of the child's relationship with Middleton would have a profound, negative impact on the child for the rest of the child's life.  *Id*. at 600–01, 633 S.E.2d at 170.

In *Marquez*, our supreme court noted this prong was met because the child always referred to the stepfather as "Dad," the stepfather was the only father figure the child ever knew, and the child's grandmother admitted that the stepfather and the child bonded as father and son.  376 S.C. at 245, 656 S.E.2d at 745.

We find Garrard met this prong.  Garrard was present for the birth of Child, and he was continuously involved in Child's life.  Child, Mother, and Garrard resided together for two of the first two and a half years of Child's life, and several witnesses indicated Garrard is the only father figure Child has ever known.  There is evidence that since Child began talking, she has always referred to Garrard as "daddy," and several witnesses agreed that Mother promoted and fostered a parent-child relationship between Garrard and Child.  Turner testified that Child needs Garrard in her life because Child has already lost too much and Garrard is good for her, and Grandmother opined that it would be hurtful for Child if Garrard were totally removed from Child's life.  Other witnesses also testified that there is a close emotional bond between Garrard and Child.  When the GAL was asked if she observed that Garrard and Child loved each other, she responded "I think so, yes," and when asked if she believed Garrard and Child are bonded, the GAL replied, "I believe so."  Thus, we find Garrard established a parental bond with Child and find the family court did not err in finding this prong was met.

Accordingly, after a review of the record, we find Garrard meets all four prongs of psychological parenthood, and we find the family court did not err in finding Garrard is Child's psychological parent.

## II.    Hearsay

Grandfather argues the family court erred in admitting a Facebook post that was posted on Mother's Facebook account on November 4, 2014 (the Facebook Post) over his hearsay objections.  We disagree.

"Hearsay is an out-of-court statement offered in court to prove the truth of the matter asserted." *Jackson v. Speed*, 326 S.C 289, 304, 486 S.E.2d 750, 758 (1997).  Rule 803(3), SCRE provides the following is not excluded by the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant's will.

The declarant's present state of mind is admissible as an exception to hearsay, but the reason for the declarant's state of mind is not.  *State v. Tennant*, 394 S.C. 5, 16, 714 S.E.2d 297, 302 (2011).

In pertinent part, the Facebook Post stated that Garrard "is such a great father to [Child], and truly my best friend."  Grandfather timely objected to the admission of the Facebook Post, arguing it was hearsay.  The family court admitted the Facebook Post, noting it was not creating a hearsay exception for social media posts, but it was accepting the Facebook Post into evidence under the hearsay exception set forth in Rule 803(3) as a statement of Mother's "then existing state of mind, emotion, sensation, specifically a mental feeling."

We find the Facebook Post was properly admitted as evidence of Mother's present state of mind at the time the Facebook Post was made.  *See* Rule 803(3).  Furthermore, we find that even if the Facebook Post was erroneously admitted, its admission was not reversible error because we find the Facebook Post is merely cumulative to other previously cited evidence that Mother consented to and fostered a parent-like relationship between Garrard and Child.  *See Bojilov*, 425 S.C. at 178, 819 S.E.2d at 800 ("When evidence is merely cumulative to other evidence, its admission is harmless and does not constitute reversible error.").

## III. De Facto Custodian

Grandfather argues the family court erred in finding Garrard is the de facto custodian of Child. We decline to address this argument. Even if the family court erred in finding Garrard is a de facto custodian of Child, such an error would be harmless because Garrard's status as a psychological parent provides standing for granting him visitation. *See Middleton*, 369 S.C. at 594, 633 S.E.2d at 167 (finding Middleton had standing to seek visitation because of his status as a psychological parent).

## IV. Custody

Grandfather contends the family court erred in awarding custody of Child to Grandmother because it was in Child's best interest for him to be awarded custody. We disagree.

In child custody cases, the controlling considerations are the welfare and best interests of the child. *Bojilov* 425 S.C. at 176, 819 S.E.2d at 800. "In making its custody determination, '[t]he family court must consider the character, fitness, attitude, and inclinations on the part of each parent as they impact the child,' and it should also consider 'the psychological, physical, environmental, spiritual, educational, medical, family, emotional[,] and recreational aspects of the child's life.'" *Id*. (alterations in original) (quoting *Woodall v. Woodall*, 322 S.C. 7, 11, 471 S.E.2d 154, 157 (1996)). When determining custody, "all the conflicting rules and presumptions should be weighed together with all of the circumstances of the particular case, and all relevant factors must be taken into consideration." *Woodall*, 322 S.C. at 11, 471 S.E.2d at 157. Subsection 63-15-240(B) of the South Carolina Code (Supp. 2019) lists seventeen factors the court may consider when determining the best interest of the child. In the Final Order, the family court listed the following factors from section 63-15-240(B) that it found relevant in this case:

> (1) the child's temperament and developmental needs; (2) the competing parties' respective willingness and ability to understand and meet the needs of the child; (3) each party's past and current interaction and relationship with the child, the child's siblings, and other significant influences; (4) each party's ability to be actively involved in the child's life; (5) each party's willingness to encourage a continuing relationship with the other family members; (6) the child's adjustment to her home, school, and community environments; (7) the stability of the

child's existing and proposed residences; (8) the mental and physical health of all individuals involved; (9) the proximity of the prospective residences to one another; (10) the child's spiritual background; and (11) other factors as the court considers necessary.

Specifically, the family court considered Child's adjustment, health, and development. Several witnesses testified Child has adjusted well to living with Grandmother and that Child is happy, healthy, and energetic in Grandmother's care. Child's daycare teacher testified she requested for Child to be moved into the four-year-old classroom before Child turned four because Child was developmentally advanced. *See* § 63-15-240(B) (requiring a court to consider the temperament and developmental needs of the child and the child's adjustment to his or her home, school, and community environments when considering the best interests of the child for custody purposes).

The family court further considered Grandmother's character, fitness, attitudes, attributes, and resources and found Grandmother had shown impressive parenting skills. Grandmother enrolled Child in daycare, secured healthcare coverage for Child, took Child to the doctor, followed up with a genetic center to obtain more information about a genetic condition Child is a carrier for, and pursued a conservatorship action to protect Child's insurance benefits related to Mother's death. Witnesses testified Grandmother is engaged with Child, takes care of Child's basic needs, and has educational time with Child. The family court highlighted Grandmother's willingness to promote Child's relationship with key figures in Child's life, such as Garrard and Grandfather. Grandmother worked with Garrard and Grandfather so they could exercise their visitation with Child even though tensions developed between Grandmother and Grandfather. *See* § 63-15-240(B)(2), (5)-(6), (9) (requiring a court to consider the capacity and disposition of a person to understand and meet the needs of the child; the past and current interaction and relationship with each person and the child; the actions of the person to encourage the continuing parent-child relationship between the child and the other parent; and the ability of the person to be actively involved in the life of the child when considering the best interests of the child for custody purposes).

The family court also considered Grandfather's character, fitness, attitudes, attributes, and resources. The family court noted Grandfather has demonstrated an inarguable love for Child, has a close family bond with Child, and has financial stability. *See* § 63-15-240(B)(5), (11) (requiring a court to consider the past and current interaction and relationship with the child and the stability of the child's

proposed residence when considering the best interests of the child for custody purposes). We find this is supported by the record. Grandfather challenges the family court's assertion that "[m]edical ailments raise questions about [Grandfather's] physical capacity to provide regular hands-on parenting to this high-energy young child." Grandfather argues he testified his issue with his sciatic nerve was treated, there was no testimony that he was not capable of taking care of Child, and the only testimony regarding his interactions with Child was his own testimony and the testimony of his neighbor, who stated Grandfather was capable of keeping up with Child. We find the record does not support Grandfather's assertions. Grandfather testified he had a pinched sciatic nerve, which resulted in his receiving injections and being out of work from June to December 2016. However, although Grandfather testified he was not going to receive any more injections, there is no other evidence in the record that he is no longer having complications from the pinched sciatic nerve, and during trial, when asked why he held his head down, he responded, "I've got a pinched nerve down the right side from my hip all the way down. It relieves the pain." Grandmother testified she did not believe Grandfather was medically or physically able to take care of or watch Child, and she expressed concerns that he would rely on his elderly mother, Arms, whom Grandmother did not believe could keep up with Child.[9] *See* § 63-15-240(12) (requiring a court to consider the physical health of those involved when considering the best interests of the child for custody purposes). Further, Grandfather testified when he is working, his work schedule would only allow him to see Child between 10:30 A.M. and 1:30 P.M. When Child begins school, she will be in school during the hours Grandfather is able to spend with her, which would result in Arms being almost entirely responsible for Child. *See* § 63-15-240(9) (requiring a court to consider the ability of a person to be actively involved in the life of the child when considering the best interests of the child for custody purposes). Grandmother also testified Grandfather did not exercise all the visitation he was entitled to under the Second Temporary Order. Grandfather testified he was unable to exercise his weekday visitation because he was working during that time; however, from June to December 2016, Grandfather was not working full time, and for a month and a half of that time, he was not working at all. The Final Order indicated the family court was concerned by Grandfather's failure to exercise the visitation and noted Grandfather's explanations for missing the visitation were "less than fully acquitting." *See* § 63-15-240(5) (requiring a

---

[9] Although Arms stated she could keep up with Child, Garrard testified he and Mother enrolled Child in daycare to work on Child's social skills and because Arms said she was getting too tired from watching Child and she was getting too old to do so.

court to consider past and current interaction and relationship with the child when considering the best interests of the child for custody purposes).

Grandfather also argues the family court erred in its concern that Grandfather was unwilling to promote a relationship between Garrard and Child. We disagree.

Grandfather avers he had no issue with Garrard attending birthday parties and other family gatherings, and he argues that although he contests Garrard having parental rights, he does not contest Garrard being involved in Child's life. However, evidence in the record suggests Grandfather would not be supportive of a relationship between Child and Garrard. The GAL testified she believed it would be harder for Grandfather to promote a relationship between Child and Garrard than it would be for Grandmother to do so. The GAL also opined that Grandmother would do more to promote Child's best interest as it related to Garrard than Grandfather would. At trial, when asked if he would encourage, foster, or allow a relationship between Child and Garrard, Grandfather answered, "I would allow him to visit, yes . . . . On her birthday or something more to come. Stuff like that." Furthermore, Grandfather's appellant's brief notes, "If the family court had not granted Garrard visitation, it is unlikely that the minor child would have any relationship with [Garrard] at all." Thus, we do not believe Grandfather would promote a meaningful relationship between Child and Garrard. *See* § 63-15-240(5) (requiring a court to consider past and current interactions and relationships with the child and any other person who may significantly affect the best interest of the child when considering custody).

Thus, based on our de novo review, and in considering the totality of the circumstances in this case, we uphold the family court's finding that it is in Child's best interest to grant Grandmother primary custody of Child. *See Woodall*, 322 S.C. at 11, 471 S.E.2d at 157 ("The welfare and best interests of the child are paramount in custody disputes."); *Parris v. Parris*, 319 S.C. 308, 310, 460 S.E.2d 571, 572 (1995) ("In making custody decisions the totality of the circumstances peculiar to each case constitutes the only scale upon which the ultimate decision can be weighed."); *Ashburn*, 420 S.C. at 416, 803 S.E.2d at 471 (noting that under de novo review, the appellant must show the preponderance of the evidence does not support the family court's findings to warrant reversal). Therefore, we do not believe the family court erred in awarding Grandmother primary custody of Child.

## V.    Attorney's Fees

Grandfather argues the family court erred in ordering him to reimburse Grandmother and Garrard for their attorneys' fees. Specifically, Grandfather argues he is incapable of paying the fees and the beneficial results obtained by Grandmother and Garrard were based on an incorrect application of the law. We disagree.

Section 20-3-130(H) of the South Carolina Code (2014) authorizes the family court to order payment of litigation expenses such as attorney's fees, expert fees, and investigation fees to either party in family matters. In determining whether to award attorney's fees, the family court should consider the following factors: "(1) the party's ability to pay his/her own attorney's fee; (2) [the] beneficial results obtained by the attorney; (3) the parties' respective financial conditions; and (4) [the] effect of the attorney's fee on each party's standard of living." *E.D.M. v. T.A.M.*, 307 S.C. 471, 476–77, 415 S.E.2d 812, 816 (1992). When the family court determines the amount of attorney's fees to award, it should consider the: "(1) nature, extent, and difficulty of the case; (2) the time necessarily devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) beneficial results obtained; [and] (6) customary legal fees for similar services." *Spreeuw v. Barker*, 385 S.C. 45, 71, 682 S.E.2d 843, 856 (Ct. App. 2009)(citing *Glasscock v. Glasscock*, 304 S.C. 158, 161, 403 S.E.2d 313, 315 (1991)). This court has found the same equitable considerations that apply to attorney's fees also apply to costs. *Garris v. McDuffie*, 288 S.C. 637, 644, 344 S.E.2d 186, 191 (Ct. App. 1986).

The Final Order noted Grandmother, Garrard, and Grandfather each sought attorneys' fees in the following amounts respectively: $14,647.81, $26,159.46, $22,115.53. The family court ordered Grandfather to pay $3,500 of Grandmother's attorney's fees and $6,500 of Garrard's attorney's fees.

Upon our de novo review, we find the evidence in the record supports the family court's allocation of attorneys' fees. We believe Grandmother and Garrard's attorneys achieved more beneficial results. Specifically, Grandmother was awarded custody and Garrard was found to be Child's psychological parent and was awarded visitation and we affirmed these results. *See E.D.M.* 307 S.C. at 476, 415 S.E.2d at 816 (requiring a family court to consider the beneficial results obtained by the attorney when determining whether to award attorney's fees). All three parties are employed. Grandmother's financial declaration indicates she has a gross monthly income of $3,131.95 per month and monthly expenses of $2,068.66. Grandmother's complaint indicated she had to borrow money to defend this action, and she testified that this custody action, a probate court action related to the conservatorship for Child, and Mother's funeral expenses have been a financial

burden.  Furthermore, Grandmother has been caring for Child without financial contributions from Grandfather or Garrard since June 2015, and we believe paying her attorney's fees would negatively impact her and Child's standard of living. Garrard's financial declaration and testimony indicate he has a net monthly income of $1,851.90, and monthly expenses of approximately $2,074.03, which results in a deficit each month.  Garrard testified he would have to obtain a loan to pay his attorney's fees and doing so would impact his standard of living.  On the other hand, Grandfather's financial declaration shows he has a total gross monthly income of $4,087 and $1,140 in monthly expenses.  On appeal, Grandfather argues he was unable to work for two months prior to the trial, he did not have full time employment for six months prior to the trial, and he was not fully employed at the time of the trial.  However, at the trial, Grandfather testified he was going to begin working again after the trial.  Based on the foregoing, we believe Grandmother and Garrard's attorneys secured a more beneficial result, Grandfather is in a superior financial position, Grandfather has a greater ability to pay the fees, and paying the fees would impact Grandfather's standard of living less than it would impact Grandmother's and Garrard's standard of living.  *See E.D.M.*, 307 S.C. at 476–77, 415 S.E.2d at 816 (requiring a family court to consider the party's ability to pay his or her own attorney's fees, the beneficial results obtained by the attorney, the parties' respective financial conditions, and the effect of the attorney's fee on each party's standard of living when determining whether to award attorney's fees). Accordingly, we affirm the family court's requirement that Grandfather pay a portion of Grandmother and Garrard's attorney's fees.[10]

## VI.    GAL Fees

Grandfather argues the family court erred in requiring Grandfather to pay a greater share of the GAL's fees.  Specifically, Grandfather argues he is incapable of

---

[10] We note that Grandfather only appealed the family court's requirement that he pay a portion of Grandmother's and Garrard's attorneys' fees, and he did not appeal the amount of their attorneys' fees he would be required to pay if this court affirmed the award of attorney's fees.  Accordingly, we do not reach this question. *See Klein v. Barrett*, 427 S.C. 74, 90, 828 S.E.2d 773, 781 (Ct. App. 2019) ("An appellate court will not pass judgment on moot and academic questions; it will not adjudicate a matter when no actual controversy capable of specific relief exists." (quoting *Sloan v. Greenville County*, 380 S.C. 528, 535, 670 S.E.2d 663, 667 (Ct. App. 2009))).

affording his fees and the GAL was only required because Garrard forced himself into the case.[11]  We disagree.

A court-appointed GAL "is entitled to reasonable compensation, subject to the review and approval of the [family] court."  S.C. Code Ann. § 63-3-850(B) (2010). The GAL filed a fee affidavit seeking $7,791 for her services.  The family court found the GAL's fee was reasonable.  *See* § 63-3-850(B) (In determining the reasonableness of a GAL's fees and costs, "the court must take into account: (1) the complexity of the issues before the court; (2) the contentiousness of the litigation; (3) the time expended by the guardian; (4) the expenses reasonably incurred by the guardian; (5) the financial ability of each party to pay fees and costs; and (6) any other factors the court considers necessary.").

We disagree with Grandfather's assertions that (1) GAL was only necessary because Garrard joined this action to protect his ability to see Child and (2) the majority of the GAL's investigation focused on whether Garrard was a psychological parent.  We find that Garrard seeking to protect his rights, when Grandfather continuously insisted he should not have visitation rights, should not lessen Grandfather's share of the fees, especially when we find Garrard is a psychological parent to Child.  Further, the GAL did not convey her opinion as to whether Garrard was a psychological parent in her report or in her testimony at the trial.  The GAL's testimony and report reveal she met with all of the parties, and she had to issue two supplemental reports and investigate further when it became apparent Grandfather and Grandmother would not be able to facilitate a joint custodial relationship.  We agree with the Final Order's assertion that "[t]he GAL's efforts aided the court in assessing the parties' various contentions, and therefore indirectly benefited [Child] and the litigants."

---

[11] Grandfather also argued the family court erred in requiring him to pay a larger portion of the GAL fees because the beneficial results obtained by Grandmother and Garrard were based on an incorrect application of law.  We decline to address this argument because this court has specifically held a family court improperly weighed a party's status as the prevailing party in its allocation of the GAL's fee award in *Klein v. Barrett*.  427 S.C. 74, 89, 828 S.E.2d 773, 781 (Ct. App. 2019); *see Loe v. Mother, Father, & Berkeley Cty. Dep't of Soc. Servs.*, 382 S.C. 457, 473, 675 S.E.2d 807, 816 (Ct. App. 2009) ("In reviewing the reasonableness of [the GAL's] fees, the family court erred in applying the factors indicated in Glasscock . . . rather than the factors mandated by the statute.").

In its allocation of the GAL's fees, the family court noted the nature and difficulty of the case, [12] the contentiousness of the litigation, the reasonableness of the GAL's charge, and Grandfather's superior financial position. *See* § 63-3-850(B) (In determining the reasonableness of a GAL's fees and costs, "the court must take into account: (1) the complexity of the issues before the court; (2) the contentiousness of the litigation; (3) the time expended by the guardian; (4) the expenses reasonably incurred by the guardian; (5) the financial ability of each party to pay fees and costs; and (6) any other factors the court considers necessary."). We find the preponderance of the evidence supports the family court's allocation of these fees because as previously discussed, Grandfather is in a superior financial position to bear the burden of fees and costs related to this action. *See Ashburn*, 420 S.C. at 416, 803 S.E.2d at 471 (noting that under de novo review, the appellant must show the preponderance of the evidence does not support the family court's findings to warrant reversal). Therefore, we find the family court did not err in its allocation of the GAL's fees.

**CONCLUSION**

Based on the foregoing, the decision of the family court is **AFFIRMED.**

**HUFF and MCDONALD, JJ., concur.**

---

[12] This case required two temporary hearings, the appointment of the GAL, and a three-day contested trial that included seventeen witnesses and sixty exhibits.